(March 28, 1911.)

# THE WASHINGTON WATER POWER COMPANY, Appellant, v. CHARLES WATERS, BERTHA E. WATERS, and SEBASTIANO DEMICCO, Respondents.

[115 Pac. 682.]

EMINENT DOMAIN—POWER OF EMINENT DOMAIN—PUBLIC USE—NECESSITY FOR TAKING—CONSTITUTIONAL GRANT—CONSTITUTIONAL CONSTRUCTION—RESERVOIRS AND STORAGE BASINS.

(Syllabus by the court.)

1. Sec. 14, art. 1 of the constitution provides that "the necessary use of lands for the construction of reservoirs, or storage basins, for the purposes of irrigation, or for the rights of way for the construction of canals, ditches, flumes, etc., . . . . for any useful, beneficial or necessary purpose, . . . . is hereby declared to be a public use, and subject to the regulation and control of the state. . . . . "

2. The constitution, sec. 14, art. 1, conferring the right of eminent domain, does not limit the "necessary use of lands" for "the construction of reservoirs or storage basins" to the "purposes of irrigation" alone, but rather intends to confer the power and authority to condemn lands for reservoirs or storage basins "for any useful, beneficial, or necessary purpose" to which water can be used or applied or for which it can be stored or impounded.

3. Sec. 5210 of the Rev. Codes, which authorizes the condemnation of land for necessary use in constructing lines to be "used in transmitting electric current for power, lighting, heating or other purposes," constitutes a legislative interpretation and construction that the authority somewhere exists for condemning lands for power sites and power stations for generating electrical current and electrical energy, and carries with it the implied power to do those things necessary in order to generate the electrical current which is to be transmitted over such lines.

4. Where it is found and determined that the use for which land is sought to be condemned is a public use, the extent or area of land to be taken, and the necessity for the taking of the particular tract or parcel of land must be left in some measure to the judgment and discretion of the agency on which the state has conferred the power of eminent domain, subject always to the ultimate and supervising judgment and control of the courts.

5.   Under the facts as disclosed by the record in this case, *held,* that the construction of a dam in the Spokane river at Post Falls, and the raising the same to such a height as to increase the height of the waters in Coeur d'Alene lake for storage purposes to be used in the low-water season for power purposes in generating electrical current and energy for lighting, heating and power, is a public use within the meaning and purview of sec. 14, art. 1 of the state constitution and sec. 5210 of the Rev. Codes.

APPEAL from the District Court of the Eighth Judicial District, for Kootenai County.   Hon. Robert N. Dunn, Judge.

Action by plaintiff to condemn a tract of land overflowed by the waters of Coeur d'Alene lake by reason of raising the level of the waters therein by means of dams and mechanical appliances placed in the Spokane river at Post Falls.   Judgment for the defendants and plaintiff appealed.   *Reversed.*

Gray & Knight and Charles L. Heitman, for Appellant.

The use and purposes for which plaintiff seeks to condemn and appropriate that portion of defendants' land described in the plaintiff's amended complaint is a public use, and a use authorized by law.   (*Hollister v. State,* 9 Ida. 8, 71 Pac. 541; *Potlatch Lumber Co. v. Peterson,* 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426; *State ex rel. Dominick v. Superior Court,* 52 Wash. 196, 100 Pac. 317, 21 L. R. A., N. S., 448; *Jones v. North Georgia Electric Co.,* 125 Ga. 618, 54 S. E. 85, 6 L. R. A., N. S., 122, 5 Ann. Cas. 526; *Baillie v. Larson,* 138 Fed. 177; *Clark v. Nash,* 198 U. S. 361, 25 Sup. Ct. 676, 49 L. ed. 1085, 4 Ann. Cas. 1171; *Strickley v. Highland Boy Gold Mining Co.,* 200 U. S. 527, 26 Sup. Ct. 301, 50 L. ed. 581, 4 Ann. Cas. 1174; *Rockingham County Light & Power Co. v. Hobbs,* 72 N. H. 531, 58 Atl. 46, 66 L. R. A. 581; *Helena Power Trans. Co. v. Spratt,* 35 Mont. 108, 88 Pac. 773, 8 L. R. A., N. S., 567, 10 Ann. Cas. 1055; S. C., 37 Mont. 60, 94 Pac. 631; *Denver Power and Irr. Co. v. D. R. G. R. Co.,* 30 Colo. 204, 69 Pac. 568, 60 L. R. A. 383; *Lamborn v. Bell,* 18 Colo. 346, 32 Pac. 989, 20 L.

R. A. 241; *Walker v. Shasta Power Co.*, 160 Fed. 856, 87 C. C. A. 660 (9th Circuit) ; *In re Niagara L. & P. Co.*, 111 App. Div. 686, 97 N. Y. Supp. 853; *Dayton Gold & Silver Mining Co. v. Seawell*, 11 Nev. 394; *Overman Silver Mining Co. v. Corcoran*, 15 Nev. 147; *Douglass v. Byrnes*, 59 Fed. 29.)

If in the end the property is devoted to a public use, the mere agency or instrumentality through which that result is accomplished is a matter of no concern. (*State v. Superior Court*, 52 Wash. 196, 100 Pac. 317, 21 L. R. A., N. S., 448; *Jones v. North Georgia Electric Co.*, 125 Ga. 618, 24 S. E. 85, 6 L. R. A., N. S., 122, 5 Ann. Cas. 526; *In re Niagara L. & P. Co.*, 111 App. Div. 686, 97 N. Y. Supp. 853; *In re East Canada Creek Electric Power Co.*, 49 Misc. Rep. 565, 99 N. Y. Supp. 109; Farnham on Waters, p. 2142.)

If the use is a public use, then unquestionably the taking of the land is necessary to carry out the use.

The condemning party is ordinarily permitted to decide what particular land is required for the purpose of carrying out the public use in which it is engaged. Of course, the right to make such selection is subject to the right of the courts to prevent an abuse of the power. (*Riley v. Charleston Union Station Co.*, 71 S. C. 457, 110 Am. St. 579, 51 S. E. 485.)

The necessity is not measured or limited by immediate needs. (*In re N. Y. C. & H. R. Co.*, 77 N. Y. 248; *In re Burns*, 155 N. Y. 23, 49 N. E. 247; *Pittsburg etc. R. Co. v. Peet*, 152 Pa. 488, 25 Atl. 612, 19 L. R. A. 467; *Kountze v. Prop. Morris Aqueduct*, 58 N. J. L. 303, 33 Atl. 252; *In re St. Paul etc. Ry. Co.*, 34 Minn. 227, 25 N. W. 345; *Spring Valley Water Works v. Drinkhouse*, 92 Cal. 528, 28 Pac. 681; *Col. Ry. etc. Co. v. Union Pac. Co.*, 41 Fed. 293–299; *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 673.)

Kerns & Ryan, for Respondents.

If the legislature or the framers of our constitution intended to grant electric power companies the right to create

reservoirs and flood lands belonging to others for that purpose, they would have unmistakably expressed their wish in words needing no interpretation; they would have declared that land might be taken for reservoirs for the creation of electric. energy by water power in the same unmistakable words that they declared that land might be taken for reservoirs for the purposes of irrigation. The right to exercise the power of eminent domain is strictly limited to the purposes specified in the constitution and statutes conferring it and cannot be gathered from doubtful inferences. (*Hudson County Water Co. v. McCarter,* 209 U. S. 349, 28 Sup. Ct. 529, 52 L. ed. 828, 14 Ann. Cas. 560; *Portneuf Irr. Co. v. Budge,* 16 Ida. 116–126, 100 Pac. 1046.)

"Inasmuch as the right of eminent domain is one which lies dormant in the state until legislative action is had pointing out the occasion, mode, condition, and agencies for its exercise, the right to exercise the power must be conferred by statute either in express words or by necessary implication. The power should not be gathered from doubtful inferences, but should be unmistakably expressed." (15 Cyc. 567, 578; Cooley Const. Lim., 7th ed., pp. 759, 761, 762, 767; *Shoemaker v. United States,* 147 U. S. 282, 13 Sup. Ct. 361, 37 L. ed. 170, 184; *Minnesota Canal & Power Co. v. Koochiching Co.,* 97 Minn. 429, 107 N. W. 405, 5 L. R. A., N. S., 638, 7 Ann. Cas. 1182; *Ligare v. City of Chicago,* 139 Ill. 46, 32 Am. St. 179, 28 N. E. 934; *United States v. Rauers,* 70 Fed. 748; *Ryerson v. Brown,* 35 Mich. 333, 24 Am. Rep. 564; *Clark v. Nash,* 198 U. S. 361, 369, 25 Sup. Ct. 676, 49 L. ed. 1085, 4 Ann. Cas. 1171; *Avery v. Vermont,* 75 Vt. 235, 98 Am. St. 818, 54 Atl. 179, 59 L. R. A. 817; *Fallsburg v. Alexander,* 101 Va. 98, 99 Am. St. 855, 43 S. E. 194, 61 L. R. A. 129; *Walker v. Shasta Power Co.,* 160 Fed. 856, 87 C. C. A. 660; *Tacoma I. Co. v. White Power Co.,* 39 Wash. 648, 82 Pac. 150, 2 L. R. A., N. S., 842, 4 Ann. Cas. 987; distinguished in *State v. Superior Court,* 52 Wash. 196, 100 Pac. 317, 21 L. R. A., N. S., 448; *Brown v. Gerald,* 100 Me. 351, 109 Am. St. 526, 61 Atl. 785, 70 L. R. A. 472; *In re Tuthill,* 163 N. Y. 133, 79 Am. St. 574, 57 N. E. 303, 49 L. R. A. 781; *Latah County v.*

*Peterson,* 2 Ida. 1118, 29 Pac. 1089; *Avery v. Vermont Electric Co.,* 75 Vt. 235, 98 Am. St. 818, 54 Atl. 179, 59 L. R. A. 817; *Head v. Amoskeag Mfg. Co.,* 113 U. S. 9, 5 Sup. Ct. 441, 28 L. ed. 889; *State v. White River Power Co.,* 39 Wash. 648, 82 Pac. 150, 2 L. R. A., N. S., 842, 4 Ann. Cas. 987; *Grande Ronde Electric Co. v. Drake,* 46 Or. 243, 78 Pac. 1031, 1033, and other cases cited; *Sterritt v. Young,* 14 Wyo. 146, 116 Am. St. 994, 82 Pac. 946, 4 L. R. A., N. S., 169.)

The right of eminent domain is one which rests solely in the sovereign, but it may be delegated by the sovereign to individuals or corporations. The delegation of authority, however, must and always is construed as a grant by the sovereign and all such grants must be strictly construed. (*U. S. v. Rizzinelli,* 182 Fed. 675; *Oregon R. & N. Co. v. Oregonian Ry. Co.,* 130 U. S. 1, 9 Sup. Ct. 409, 32 L. ed. 837; *Coosaw M. Co. v. South Carolina,* 144 U. S. 550, 12 Sup. Ct. 689, 36 L. ed. 537; Dillon, Municipal Corp., 603; *Johnson v. Schmidt,* 90 Wis. 301, 63 N. W. 288; *S. W. Mo. Light Co. v. Scheurich et al.,* 174 Mo. 235, 73 S. W. 496; *Pickman v. Inhabitants of Peabody,* 145 Mass. 480, 14 N. E. 751; *Howard Mills Co. v. Schwartz Lumber & Coal Co.,* 77 Kan. 599, 95 Pac. 559, 18 L. R. A., N. S., 356; Lewis' Sutherland Stat. Const., sec. 548, 559; *Central Transp. Co. v. Pullman's Palace Car Co.,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. ed. 55; 1 Lewis' Em. Dom., sec. 371, 388; *Penn Telephone Co. v. Hoover,* 209 Pa. 555, 58 Atl. 922; *Fort Ridge Bap. Cem. Assn. v. Redd,* 33 W. Va. 262, 10 S. E. 405; *New York etc. R. R. Co. v. Kip,* 46 N. Y. 546, 7 Am. Rep. 385.)

AILSHIE, Presiding J.—This action was commenced by the appellant for the purpose of condemning a tract of land owned by respondents, and lying along the shores of Anderson lake and being between the Anderson lake and Coeur d'Alene river. The condemnation is sought for the purpose of overflowing this land.

The Washington Water Power Company is a corporation doing business in Shoshone and Kootenai counties, as well as in Spokane, Washington. It has been engaged for many

years in operating an electrical generating water power plant at the natural waterfalls in the Spokane river at Spokane, Washington, and from thence supplied the city of Spokane with electricity for light, power and heating purposes, and also in supplying electricity for lighting and power purposes to various mining companies in Shoshone county. It has been delivering the electrical energy and power to consumers in the Shoshone mining region by means of an electric power transmission line constructed directly from its plant in the city of Spokane.

About the year 1907 this same company erected dams and constructed an electric power plant on the Spokane river at Post Falls in Kootenai county, upon ground owned by it, at the natural waterfalls of Post Falls. The main dam constructed by plaintiff at Post Falls is equipped by a series of headgates and has fixed and attached upon the overflow thereof a mechanical contrivance, known as, and called a bear-trap, by means of which the waters of the dam can be raised and held approximately ten feet higher than the overflow of the dam. The overflow of the dam is approximately three and one-half feet below the level of Coeur d'Alene lake, which is ten miles distant up the river from these falls. The Spokane river is outlet to Coeur d'Alene lake. The Coeur d'Alene lake is a body of water about twenty-five miles in length, by an average of about two miles in width; this lake is supplied and fed by the waters of the Coeur d'Alene and St. Joe rivers. Those rivers have deep channels and but slight current for a distance of some twenty-five miles up the stream from the places where they empty into the lake. Along these rivers and the small lakes and bodies of water tributary thereto, and from which they furnish the outlet, there are large areas of low meadow-lands which drain into these rivers at times of low water. These bodies of meadow and grass lands contiguous to the streams and lakes comprise many thousands of acres. Late in the summer and early autumn the waters recede and the Coeur d'Alene lake itself is several feet lower than it is during what is commonly known as the high-water period. The appellant company,

by closing its headgates at Post Falls and raising the bear-trap, is enabled to raise and hold the level of the waters of Coeur d'Alene lake and the Coeur d'Alene and St. Joe rivers about six and one-half feet higher than their natural level, and the waters when so held overflow and cover many thousands of acres of the low meadow and grass lands along and contiguous to these streams, including about sixty acres belonging to the respondents. By means of thus raising the dam at Post Falls and accordingly raising the elevation of the water in the Coeur d'Alene lake approximately six and one-half feet, the appellant is enabled in seasons of low water to increase the capacity of its two plants, the one at Post Falls in Idaho, and the one in Spokane, Washington, approximately 18,000 horse-power. Of this increased capacity approximately 4,750 additional horse-power is generated at Post Falls.

The present action is one of a number of actions which appellant seems to have commenced for the purpose of condemning the lands which it overflows by reason of placing the dam in the river at Post Falls and erecting the bear-trap. In this case appellant alleges in its complaint that it is proceeding to condemn the lands for a public use; that such use will consist in making and using the Coeur d'Alene lake as a natural reservoir for the storage of water to be used for power purposes in the generation of electrical current. It is alleged in the complaint that the company purposes to furnish electrical current for lighting purposes to the cities and towns of Post Falls, Rathdrum and Coeur d'Alene in Kootenai county, and to Wardner, Mullan, Kellogg and Burke and other incorporated and unincorporated towns and cities in Shoshone county, Idaho, and to furnish electrical power for the purpose of pumping water to be used for domestic and municipal purposes in the cities of Coeur d'Alene and Post Falls, Idaho, and to furnish electrical current for the operation of an electrical railroad between the city of Coeur d'Alene and the town of Post Falls, Idaho, and the city of Spokane, Washington, and an electrical railroad between Hayden lake and Coeur d'Alene, Idaho, and also to

furnish electrical current for use in the operation and development of the mines in Shoshone county, Idaho, and for the working thereof by means of railroads, tramways, hoisting works, and other necessary means for their complete development.

The court received a great volume of evidence on the question as to whether or not "the use to which the plaintiff seeks to apply the land of the defendants sought to be condemned is a use authorized by law, or whether the taking of such land is necessary to said use." After hearing the proofs and the arguments of counsel the court made findings of fact covering in detail the facts above set out, and many other facts in connection with appellant's purposes and operations. From the facts thus found the court reached the following conclusions of law:

First, "That the use to which the plaintiff seeks to apply the land of the defendant, Charles Waters, is not a public use or a use authorized by law."

Second, "That the taking of the land of the defendant, Charles Waters, is not necessary for such use."

The court denied the appellant the right to condemn the lands of the respondents, and entered a decree accordingly, from which this appeal has been prosecuted.

Two propositions of law are presented on this appeal, upon each of which the appellant contends that the judgment should be reversed. First, it is contended by appellant that the statute, sec. 5210, Rev. Codes, and the constitution, sec. 14, art. 1, declare, if not specifically then by necessary implication, that the use for which it seeks to condemn the land herein is a public use, and that this case falls directly within the terms of the statute and of the constitution, and that it is accordingly entitled to condemn the respondent's land for such use.

In the second place, appellant contends that if the use for which it seeks to condemn respondent's land is not specifically named in the statute or the constitution or included therein by necessary implication, it falls within the clause of the constitution (sec. 14, art. 1) which authorizes a con-

demnation for ''any other use necessary to the complete development of the material resources of the state.''

Considering the first question above stated, we find' that sec. 14, art. 1 of the constitution provides as follows: ''The necessary use of lands for the construction of reservoirs or storage basins, for the purposes of irrigation, or for the rights of way for the construction of canals, ditches, flumes, or pipes to convey water to the place of use, for any useful, beneficial or necessary purpose, or for drainage; or for the drainage of mines, or the working thereof, by means of roads, railroads, tramways, cuts, tunnels, shafts, hoisting works, dumps, or other necessary means to their complete development, or any other use necessary to the complete development of the material resources of the state or the preservation of the health of its inhabitants, is hereby declared to be a public use, and subject to the regulation and control of the state. . . . . ''

The debates in the constitutional convention over the adoption of this section of the constitution were quite exhaustive, extending over a period of some two weeks, and were engaged in by some of the ablest lawyers and judges of the state. The original draft of this section was rejected by the convention, and the section, as it is now embodied in the constitution, with the change and alteration of only a few words, was reported to the convention by the joint committees on bill of rights, mines and mining, and manufacture, agriculture and irrigation. Every· clause of this section as finally adopted was specifically referred to by one or more of the members of the convention in the course of the debate. It was repeatedly stated, in some form or other, by many members of the convention that this section ''covers every imaginable purpose that water can be used for, and that the right of eminent domain to condemn private property for public use can be extended under this section to any useful or beneficial purpose.'' Mr. Ainslie, in speaking of this, said: ''Now if these rights are given, we have covered agriculture and the irrigation interest and the mining interest, and we have covered any other useful or beneficial or necessary purpose.''

He therefore moved to strike the clause "or any other use necessary to the complete delevopment of the material resources of the state," and he insisted that the latter clause was not necessary because they had covered every other use to which water could be applied.  So far as we have been able to find, few members of the convention seemed to have referred specifically to the construction intended to be placed upon the first clause, namely, "the necessary use of lands for the construction of reservoirs or storage basins, for the purposes of irrigation, etc. . . . . . "  Reference was made to it by Judge Beatty, then chief justice of the supreme court, and Mr. Claggett, who was president of the convention. Judge Beatty asked Mr. Reid if the first clause did not all "refer to 'purposes of irrigation.' "  Mr. Reid apparently did not answer the question.  After a vote was taken upon a substitute offered by Mr. Batten, Mr. Claggett stated that he desired to refer to the matter of punctuation contained in the first clause, and after reading as follows, "the necessary use of the lands for the construction of reservoirs or storage basins for the purpose of irrigation," he said: "There should be a semicolon"; and then he proceeded to read the remaining portion of the sentence.  To these observations no one seemed to make any reply.  In the section, however, as enrolled and filed with the secretary of state, the punctuation is as follows: A comma appears after the word "reservoirs," and thereafter the word "basins," a third after the word "irrigation," the fourth after the word "canals," and no semicolon appears at all until after the word "drainage."  This section has always been printed as above indicated with the exception that the comma has been omitted in the printed copies. after the word "reservoirs."  The words "reservoirs or storage basins" were frequently used and referred to in the debates in an independent sense, separate and apart from the idea of their construction or use alone "for the purposes of irrigation," and it is evident from the discussion of most of the members of the convention that they understood that these words were used in a distinct and independent sense, unmodified by anything except the *necessity* of the use and

*application to a useful or beneficial purpose.* In other words, it was clearly the purpose and intention of the members of the convention that the "necessary use of lands for the construction of reservoirs or storage basins" should cover all useful and necessary purposes for which water could be stored, and to which it could be used and applied, and that it was not the intention that the use should be limited "to the purposes of irrigation" alone.

The convention, in the consideration of this section of the constitution, was dominated by two interests which were at that time the paramount interests of the state, namely, mining and irrigation, and so the members from one part of the state were all the time discussing the question with the end in view of forever setting at rest in the fundamental law the question of every useful or beneficial purpose for which waters could be stored or applied in the course of irrigation. The members from other sections of the state engaged in the debate with their minds chiefly centered on the great mining industry of the state, and the exercise of the power of eminent domain for all purposes necessary to the "complete development" of the mineral resources of the state. Between these two great interests the general consensus of opinion was reached that sec. 14, art. 1 should be drawn so broadly and comprehensively as to include, among other things, every necessary or beneficial use for which water could be stored or to which it could be applied.

Our examination of this matter after two hearings in this case convinces us that it was the purpose of the framers of the constitution in drafting sec. 14, art, 1, to authorize "the necessary use of lands for the construction of reservoirs, or storage basins, . . . . for any useful, beneficial or necessary purpose" for which water might be stored, whether it be for purposes of irrigation, for domestic or municipal purposes, for power purposes, or for any other purpose that might be useful or beneficial. If we should so construe this sentence as to limit the meaning of the words "reservoirs or storage basins" by the words "for purposes of irrigation," we would then not only be limiting the scope of meaning of the words

"reservoirs or storage basins," but we would also thereby limit the meaning of the words "for purposes of irrigation," and deprive the latter of any separate or independent meaning or significance of its own whatever. Lands are necessary for "the purposes of irrigation," for uses other than reservoirs or storage basins. Pumping stations are often necessary in order to get water for irrigation, and water-wheels and power sites for electric power in pumping, and dams and diverting works are generally necessary along and across streams for the purpose of diverting the required volume of water into the ditch, canal, or flume that is to convey the water to the place of intended use. And so it seems to us that the framers of the constitution meant the same as if the first clause had been repeated each time, and the sentence had been constructed to read thus: The necessary use of lands for the construction of reservoirs; the necessary use of lands for the construction of storage basins; the necessary use of lands for the purposes of irrigation; the necessary use of lands for rights of way for the construction of canals, etc.. etc., is hereby declared to be a public use, etc.

This construction of sec. 14, art. 1, is decisive of the case at bar. It is admitted by all parties that the condemnation here sought is for reservoir or storage basin purposes; in other words, the appellant seeks to enlarge the capacity of Coeur d'Alene lake by means of a dam and bear-trap at Post Falls, and this increased reservoir or storage basin capacity is for the specific purpose of generating electricity; it is for power and lighting purposes. There is no question but that these purposes are *useful and beneficial.* The generation of electrical current by means of water power is one of the most useful, beneficial and necessary purposes known today in the business, commercial, and we may add, the home life of the state; electrical current and electrical energy is used in almost every home in our cities, towns and villages, and is employed in practically every business house and every manufacturing industry in the state; it has come to be a necessity. (*Rockingham Light & .Power Co. v. Hobbs,* 72 N. H. 531, 58 Atl. 46, 66 L. R. A. 581.)

The legislature of the state by sec. 5210 has authorized the condemnation of lands for the construction of "reservoirs," and it has likewise recognized the public use and necessity of constructing lines to be "used in transmitting electrical current for power, lighting, heating or other purposes." Now it is clear that there would be no occasion for transmitting electrical current for power, lighting, or other purposes, if the authority did not exist to secure sites for generating the electrical current; in other words, the electrical current must be generated in some manner, and somewhere, before there would be any occasion for erecting lines to transmit the current. Sec. 5210 may be reasonably viewed as a legislative construction that the power already either existed as a constitutional grant, or that it was conferred by the statute to condemn for reservoir and power sites for generating electrical energy. The legislature therefore evidently considered that the authority had in some way been granted by the state to condemn lands for reservoirs or storage basins and for power sites in order to generate electrical current. Electrical energy must be generated by one of two means: either by steam or water power. The latter is the more practicable and least expensive. Electrical energy was being generated in the state at the time of the adoption of the constitution, and that by means of water power as well as by steam. As early as January, 1903, this court in *Hollister v. State,* 9 Ida. 8, 71 Pac. 541, was considering the question of the right to condemn state lands immediately below the Shoshone Falls in Lincoln county, for an electrical power station, and the question arose as to the sufficiency of the allegations of the complaint to show that the use was a public use. The court said: "Finding No. 3 is 'that said use is a public use.' The point urged has, therefore, not been properly saved, but, waiving that question, we have examined the entire record, and are fully satisfied that the use for which the lands are claimed is a public use, as defined by sec. 5210 of the Revised Statutes and section 14 of article 1 of the state constitution." While the question of power was not considered in detail in that case, still the construc-

tion there placed on the constitution and statute has been acquiesced in ever since by all the departments of the state government, and has evidently been acted upon by those seeking to condemn lands, and has been accepted by the trial courts as the law of the state. As we said in the Hollister case, we repeat here, that the use for which the land is sought to be taken in this case is clearly a public use within the provisions of sec. 14, art. 1 of the constitution and the provisions of sec. 5210 of the Rev. Codes.

Our determination of the first question as above announced renders it unnecessary to deal in this opinion with the other question that has been raised. Whether the ascertainment and determination that any use other than those specifically enumerated is "necessary to the complete development of the material resources of the state" is a legislative or a judicial question, becomes immaterial in this case.

The court erred in concluding that the use for which the land was sought is not a use authorized by law.

The trial court also concluded in this case that the taking of the land of defendant was not necessary for the use for which the condemnation was sought. This conclusion appears to have been based on the fact, chiefly, that the company did not need to increase the capacity of Coeur d'Alene lake in order to generate sufficient electrical current to supply the demands of the people of Idaho, and that the condemnation could not be had for a public use in order to supply the citizens of another state. This conclusion is in part correct and in part erroneous. Condemnation could evidently not be had in this state for the purpose alone of serving a public use in another state, but where the use for which the condemnation is sought is a public use in this state, and will serve the citizens of this state—their demands, necessities and industries—the fact that it may incidentally also benefit the citizens and industries of a neighboring state will not defeat the right of condemnation. Again, there must be conceded to the condemning company some discretion as to the extent of the enterprise they will inaugurate, and the amount of investment they will make for the purpose of anticipating

the future development of the country, the increased population and multiplied demands for the public service which they are about to inaugurate.

If in the meanwhile the company or corporation vested by the state with the power of eminent domain, and charged with a public service, has made a sufficient investment and inaugurated a service which is capable of supplying all the reasonable demands of the citizens of this state, and they find themselves still able to serve others without impairing or diminishing their service to the people of this state, there can be no legal reason why they should not furnish their service to others, even though they be residents of another state, and engaged in business within such jurisdiction. In this connection it is worthy of observation that some of the public services which may be rendered by corporations vested by the state with the power of eminent domain, involve alike the citizens and industries of neighboring states. For example, in this case it appears that the appellant is furnishing power for an electric railroad company that is operating between Coeur d'Alene city in this state and Spokane, in the state of Washington. It would be difficult, and indeed unreasonable, to say that the energy generated by the water power of this state should only be used in operating cars to and from the state line, and that in order to propel them thence to Spokane and back to the state line the company must secure its power in some other way and from some other source. It would be equally as necessary for the citizen to get from the state line to Spokane if he had business in Spokane as it would be for him to get from Coeur d'Alene to the state line, and the walking would probably be equally as distasteful. This demonstrates the correctness of the proposition above stated that the test must be—is the use a public use within this state, and does it serve the interests of the people of this state? If it does so, the fact that it incidentally or in connection therewith likewise serves the interests of a neighboring state, and the people of such state, will not render it any the less a

public use, or the service any the less a public service, subject to the regulation and control of the state.

If, after the company shall have procured ground, rights of way for transmission lines and reservoirs for storage purposes, and inaugurated its system, it should use its electrical energy in another state or sell it to the citizens of another state for use therein, and decline to supply any of the demands of the citizens and industries of this state, then there would be occasion for complaint, and in a proper case the courts, in the exercise of the constitutional power reserved to the state to "regulate and control" the agencies on which the right of eminent domain is conferred, would command and, if necessary, reach out and compel those agencies to direct the exercise of these public uses to the service of the state and its citizens and industries. (*Potlatch Lumber Co. v. Peterson,* 12 Ida. 769, 118 Am. St. 233, 88 Pac. 426; *Connolly v. Woods,* 13 Ida. 591, 92 Pac. 573; *State v. Superior Court,* 52 Wash. 196, 100 Pac. 319, 21 L. R. A., N. S., 448.)

Capital is a timid thing, and is seldom found in the hands of those who would invest it so recklessly as to establish a business for the service of the public of such enormous expense and capacity that there would be no adequate market for its entire service and output, either at the present or within a reasonable time in the future. In these, as in all other matters, the court must be guided in a measure by the common experience of mankind, and the usual and ordinary methods employed in transacting business. As men, we know that business concerns and corporations are not at all likely to build an electrical plant and power station so great and entailing such enormous expense that it cannot, in the ordinary course of business, expect within a reasonable time in the future to be able to utilize or sell its entire output in the way of power and electrical energy and current.

The judgment of the company seeking to condemn would be ordinarily safer and more reliable than would be the judgment of any court. The court is to judge, as a matter of law in the first place, as to whether the use for which the condemnation is sought is a public use within the contemplation of

the constitution or the statute. After that question is determined by the court, the question of the extent of the enterprise and necessity for the taking should be in a large measure left to the judgment and discretion of the public agency seeking to make the condemnation. (*Smith, Jr., et al. v. C. & W. I. R. R. Co.,* 105 Ill. 511; *Riley v. Charleston Union Station Co.,* 71 S. C. 457, 110 Am. St. 579, 51 S. E. 487; *Kountze v. Proprietors of Morris Aqueduct,* 58 N. J. L. 303, 33 Atl. 253; *O'Hare v. Chicago etc. Ry. Co.,* 139 Ill. 151, 28 N. E. 923–925; *Chicago & N. W. Ry. Co. v. Morehouse,* 112 Wis. 1, 88 Am. St., note pp. 941–946, 87 N. W. 849, 56 L. R. A. 240; *Kansas & T. Coal Ry. Co. v. N. W. Coal & M. Co.,* 161 Mo. 288, 84 Am. St. 717, 61 S. W. 684, 51 L. R. A. 936; *Samish River Boom Co. v. Union Boom Co.,* 32 Wash. 586, 73 Pac. 673; *Colorado E. Ry. Co. v. Union Pac. Ry. Co.,* 41 Fed. 299; *Pittsburg Ft. W. & C. R. Co. v. Peet,* 152 Pa. 488, 25 Atl. 612, 19 L. R. A. 467; *In Matter of N. Y. C. & H. R. Co.,* 77 N. Y. 248.) Of course, this will always be subject to regulation and control by the court. It cannot be arbitrarily exercised in any case.

The judgment and order of the district court is *reversed,* and the cause is remanded for further proceeding in harmony with the views herein expressed.

This being a condemnation case, the party seeking to condemn must pay all costs of the appeal as well as the costs of the proceeding in the lower court. (See opinion on petition for rehearing in *Portneuf-Marsh Valley Irrigation Co. v. Portneuf Irrigating Co., ante,* p. 483, 114 Pac. 19, filed at the January, 1911, term of this court.) Costs awarded in favor of respondents.

Sullivan, J., and Woods, District Judge, concur.

(May 22, 1911.)

ON PETITION FOR REHEARING.

SULLIVAN, J.—A petition for a rehearing has been filed by counsel for respondent, couched in such discourteous language as illy comports with the courtesy due courts of justice.

Regardless of the fact that counsel is "firmly of the opinion" that the court misunderstood the facts and erroneously construed certain provisions of the constitution and sections of our statute, on a re-examination of the matter, we are fully satisfied that we understood the facts and that our construction of the provisions of our constitution and statute was correct. No question has been raised by the petition that was not carefully considered in our former opinion, and we are satisfied that our decision, both as to the law and facts, was correct, and a rehearing is denied.

Counsel ought to learn that neither the language nor style employed in his petition will aid the court or further the interests of his client, and that in no way can they promote justice or increase or foster that confidence which ought always to exist between attorney and court. He ought also to have learned ere this that however learned and wise counsel may be, it is still the prerogative and indeed the duty of the court to exercise and act upon its own deliberate judgment, even though that judgment should lead it to differ from counsel.

The petition in this case is ordered stricken from the files.

Ailshie, Presiding J., and Woods, District Judge, concur.