566 P.2d 769

**W. W. RITTER and Marjorie K. Hull, Plaintiffs-Respondents,**

v.

**Norman S. STANDAL and George H. Lemmon, and Aquaculture Industries, Inc., a corporation, Defendants-Appellants.**

**No. 11971.**

Supreme Court of Idaho.

July 12, 1977.

William L. Vasconcellos and Dale G. Higer of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendants-appellants.

Bert Larson of Parry, Robertson, Daly & Larson, Twin Falls, Edward W. Clyde of Clyde & Pratt, Salt Lake City, Utah, for plaintiffs-respondents.

BAKES, Justice.

The controversy in this action arose out of the construction of a fish farm in an estuary of the Snake River in the Thousand Springs area. The defendants Norman S. Standall and George H. Lemmon originally owned and constructed the fish farm; the defendant Aquaculture Industries, Inc., was added as a defendant after it acquired an interest in the fish farming operation. The plaintiff Marjorie Hull owns land riparian to the estuary and to the Snake River. The plaintiff Ritter owns land bordering Hull's land and other land in the area. The defendants have appealed to this Court from the judgment and order of the trial court that they remove the fish farm from the estuary and restore the estuary as nearly as practical to its natural condition. We affirm.

In its westerly flow through southcentral Idaho the Snake River is confined for several miles to a deep canyon with volcanic rock walls. Toward the downstream or westerly end of this gorge, a large number of springs flow from the northern canyon walls with water whose source is believed to be in the sinks of the Lost River Basin some one hundred to one hundred and fifty miles to the northeast. These springs, for which the Thousand Springs area was named, have long been recognized as a unique scenic and geological attraction, as shown in Exhibit 20, Vol. 85, The National Geographic Magazine, "Idaho Made the Desert Bloom," pp. 641–688 (June, 1944). One of these springs, Bridal Veil Springs, whose flow exceeds 200 cubic feet per second, was the principal source of non-Snake River water in the estuary in question. Before the fish farm was constructed water from Bridal Veil Springs and other nearby springs and from the Snake River filled the estuary's long, narrow channel, which ran roughly parallel to the Snake River and extended approximately 1,000 feet from the springs in the

canyon wall to the estuary's confluence with the Snake River. The construction of the fish farm completely filled in the lower end of the estuary and left Hull's land, which was riparian to the upstream end of the estuary, with no outlet through the estuary to the Snake River. The filling in of the estuary prevented all boat traffic from the Snake River to the foot of Bridal Veil Falls.

Based upon a finding that the estuary in question was navigable, the trial court concluded that the construction of the fish farm in the bed of the estuary, preventing its use as a public highway, was a nuisance and was in violation of the plaintiffs' and the public's right to use the estuary as a public highway. The court enjoined the defendants from maintaining their fish ponds and dams within the natural channel of the estuary and ordered them to remove the dams and obstructions from the estuary and to restore the channel as nearly as practical to its natural condition. The defendants appealed, contending in their assignments of error that the following district court findings or conclusions were in error: (1) the estuary was navigable; (2) the Department of Water Administration had not authorized the obstruction of the estuary; (3) the Department of Water Administration could not authorize the obstruction of the estuary; and (4) the obstruction of the estuary was a public nuisance which the defendants had to remedy by restoring the estuary to its natural condition. We address the assignments of error in that order.

■ *The navigability of the estuary.* At the time the fish farm was constructed and while these proceedings were in the district court, the statutory definition of navigability for purposes of fishing was found in I.C. § 36–907.[1] This section provided in pertinent part:

---

1. The 1976 legislature extensively revised and wholly recodified Title 36 of the Idaho Code in chapter 95 of the Session Laws. The legislature provided in that Session Law that I.C. § 36–907, quoted in the text, would remain in effect until January 1, 1977. That same Ses-

sion Law enacted a new I.C. § 36–1601, effective on January 1, 1977, which provides in pertinent part:

"36–1601. Public waters—Highways for recreation.

"36–907. Navigable streams for fishing.—For the purpose of this act, the following streams or parts of streams are declared navigable streams: . . . Snake River as far up as Big Springs, the south fork of Snake River as far up as the Wyoming state line; . . . and every other stream or part of a stream on which logs or timber can be floated to market or the place of use during the high water season of the year. For the purpose of this act, logs and timber are defined as any cut timber having a diameter in excess of six (6) inches; high water is defined as the time of year when the stream normally carries its greatest volume."

Although the statutory definition referred only to navigability of streams for purposes of fishing, it was similar to the common law definition of navigability under state law for other purposes, footnote 1, *supra*, and it or its common law equivalents have been applied to determine navigability both for purposes of fishing and for other purposes such as recreation or commerce. *E. g.*, *Southern Idaho Fish & Game Assoc. v. Picabo Livestock, Inc.*, 96 Idaho 360, 528 P.2d 1295 (1974).

The evidence introduced at trial showed that during the past four decades the estuary had been used by boaters for fishing and had served as a highway for boating, hunting, picnicking or sightseeing. Furthermore, there was testimony from one of the witnesses who had boated on the estuary that a six inch log could be floated in the estuary. This and other evidence supports the trial court's finding that the estuary was navigable.

The appellants argue that the evidence demonstrates that a downstream dam on the Snake River had raised the level of the water at the estuary and it was this raising of the water by the downstream dam which led to any navigability of the estuary. However, the effect of the dam was not entirely clear from the evidence. There was evidence to show that it had very little effect upon the level of the water in the estuary, and the trial court so found. In any event, if the level of the stream at high water in its natural state is the test of navigability, then there was substantial evidence that prior to the construction of any dams on the Snake River the high water mark of the river during spring runoff was probably higher than the level in the estuary as the result of the dam. Whether the evidence is considered either before or after dams, the evidence supports the finding that the estuary was navigable. That finding is not clearly erroneous and will be upheld on appeal. I.R.C.P. 52(a).

■ *The defendants' water license and its bearing upon the defendants' construction of the fish farm in the estuary.* The defendants' next arguments concern their contention that the approval of their water license application, which authorized them

(a) Navigable Streams Defined. Any stream which, in its natural state, during normal high water, will float cut timber having a diameter in excess of six (6) inches or any other commercial or floatable commodity or is capable of being navigated by oar or motor propelled small craft for pleasure or commercial purposes is navigable.
"(b) Recreational Use Authorized. Navigable rivers, sloughs or streams within the meander lines or, when not meandered, between the flow lines of ordinary high water thereof, and all rivers, sloughs and streams flowing through any public lands of the state shall be open to public use as a public highway for travel and passage, up or down stream, for business or pleasure, and to exercise the incidents of navigation—boating, swimming, fishing, hunting and all recreational purposes.
 . . . ."

The tests of navigability set forth in the repealed statute and the newly enacted statute are apparently codifications of tests appearing in decisions in this Court. The repealed statute was apparently a codification of the common law test of navigability for purposes of use of waters as public highways for commerce found in decisions such as *Mashburn v. St. Joe Improvement Co.*, 19 Idaho 30, 113 P. 92 (1911); and *Idaho Northern Railroad Co. v. Post Falls Lumber Co.*, 20 Idaho 695, 119 P. 1098 (1911), while much of the language of the newly enacted statute appears to be a codification of the tests of navigability for fishing and other recreational purposes set forth in *Southern Idaho Fish & Game Assoc. v. Picabo Livestock, Inc.*, 96 Idaho 360, 528 P.2d 1295 (1974).

to divert water from the springs to apply to beneficial use in the ponds of their fish farm, constituted the consent of the sovereign to construct the fish farm in the estuary. However, the license which the defendants received did not authorize the construction of the fish farm in the estuary (indeed, there is nothing to indicate that such a question was ever presented or considered in the application for a water license), but even if the license had, the water licensing authority, which was originally known as the Department of Reclamation, but whose name was changed to the Department of Water Administration in 1970 and changed again to the Department of Water Resources in 1974, I.C. § 42–1801a, see footnote 1, *Briggs v. Golden Valley Land & Cattle Co.*, 97 Idaho 427, 429, 546 P.2d 382, 384 (1976), had no authority to consent to the construction of the ponds in the estuary because that authority was vested elsewhere by statute.

Control of the beds of navigable streams in Idaho is under the authority of the State Land Board and the State Board of Land Commissioners, the bodies having general control over the public lands and navigable waters of the state. Idaho Constitution, Art. 9, §§ 7, 8; I.C. §§ 58–101 *et seq.* In 1967 the legislature explicitly defined the State Board of Land Commissioners' authority over lands in the beds of navigable waters by enacting the following subsection of I.C. § 58–104, which provides in pertinent part:

"58–104. State land board—Powers and duties.—The state board of land commissioners shall have power:

. . . . .

"9. To regulate and control the use or disposition of lands in the beds of navigable lakes, rivers and streams, to the natural or ordinary high water mark thereof, so as to provide for their commercial, navigational, recreational or other public use; provided, that the board shall take no action in derogation of or seeking to interfere with the riparian or littoral rights of the owners of upland property abutting or adjoining such lands; except that when necessary to provide for the highest and best use of such lands for commercial, navigational, recreational or other public purposes, the board may acquire the riparian or littoral rights of upland owners by purchase or gift. The term 'natural or ordinary high water mark' as herein used shall be defined to be the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes. . . . "

This act clearly gave the State Board of Land Commissioners, not the predecessors of the present Department of Water Resources, the authority to regulate and control the use of the beds of navigable waters. The defendants have not cited any statutes, nor have we found any statutes in our own research, which at the time that the fish farm was constructed vested in the predecessors to the Department of Water Resources any power or authority over the beds .of navigable streams.[2] Accordingly,

---

**2.** Since the time the fish farm was constructed and this suit was initiated, the legislature has passed at least two acts which would be relevant to the disposition of this appeal were they applicable. The first was I.C. §§ 42–3801 *et seq.*, sometimes known as the Stream Protection Act, which was enacted in 1971 and became effective on July 1 of that year. This act regulates alterations of all streams and channels of this state, including navigable streams and channels, and puts the primary responsibility for administration of the act in the Department of Water Resources. However, I.C. § 42–3803(b) provides that permits for the alternation of a stream channel must show whether the Department of Lands has authorized the alteration or whether an additional permit from the Department of Lands is required before the alteration may proceed, i. e., it recognizes the State Land Board's and the State Department of Lands' constitutional and statutory authority over the beds of navigable waters.

Thus, even if this act had been in effect when construction of the fish ponds began, it would not have placed exclusive control over the alteration of navigable streams within the Department of Water Resources or its predecessors, and sole approval of the Department of Water Resources or its predecessors would not have constituted consent of the sovereign to fill in the estuary bed.

even if the defendants' water license had explicitly allowed them to construct the fish farm in the estuary, which it did not,[3] the license would not have been a valid consent of the sovereign to construct the fish farm in the estuary because another agency had been vested by statute with authority over the bed of this estuary.

■ *Obstruction of navigable waters as a nuisance.* I.C. § 52–101 provides the following:

"52–101. Nuisance defined.—Anything which . . . unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, stream, canal, or basin, . . . is a nuisance."

The evidence clearly shows that the construction of the fish farm in the estuary was a nuisance as defined by I.C. § 52–101 because it obstructed free passage of a navigable estuary of the Snake River. Furthermore, any person specially injured by a nuisance, whether it be a public or a private nuisance, may bring an action to remedy the nuisance. I.C. § 52–204; I.C. § 52–302. The nuisance in this case deprived the plaintiff respondent Hull of the right of ingress and egress to her property via the estuary; thus, she had a right under the statutes to bring this action to ask the court for abatement of the nuisance.

■ Finally, the holdings of this Court in other cases, although not phrased in terms of nuisance, make it clear that riparian or littoral property owners upon navigable waters have a right to unobstructed access to the navigable waters along the entire length of their waterfront and may enjoin persons obstructing their waterfront or access to their water front from continued obstruction. For example, in *West v. Smith*, 95 Idaho 550, 511 P.2d 1326 (1973), this Court said:

"The littoral owner's right of access to the lake, free from unreasonable interference, attaches to all points of his shoreline, . . . A fixed structure connecting a houseboat to the shore, erected

Next, it is possible that this case could have been covered by I.C. §§ 58–142 *et seq.*, passed in 1974, which concerns encroachment upon navigable bodies of "relatively still or slack water." I.C. § 58–143(a). Although this act, which became effective in April of 1974, provides that the State Board of Land Commissioners is the administrative agency with authority to approve or disapprove of encroachments upon the beds of navigable waters covered by the act, I.C. §§ 58–144, –146, and further provides that encroachments in existence less than five years must be considered by that board to determine whether they shall be abated, I.C. § 58–151, the act does not clearly provide that litigation under way at the time the act became effective concerning such encroachments must end so that the question could be transferred to the State Board of Land Commissioners rather than continue to be considered by the courts. We will not construe the act to retroactively deprive the courts of jurisdiction over cases already before them even if it would require that all other cases be initiated in the administrative agency rather than the courts. Therefore, even if the waters in the estuary were "relatively still or slack water," the act would not be applicable to this case.

**3.** The order of the director of the Department of Water Administration, dated November 9, 1970, approving appellant's application for permit, stated in part:

"Plans and specifications showing the location and type of structures to be installed and method of construction shall be submitted to this office for approval. The use of or alteration of stream channels shall be subject to all applicable provisions of State and Federal law."

The order approving appellant's application for water permit was contested in the district court for Gooding County by other competing applicants, and the Department's order approving appellant's application was affirmed by the district court on April 12, 1971. Thereafter, in a letter to appellants' counsel dated January 3, 1974, the director of the Department of Water Administration stated that "we recognize that the work has now essentially all been completed and there is no further need for your clients to submit plans to this office for our approval. The matter was submitted to the Court of Twin Falls County and the Court's approval of the project and its subsequent construction has satisfied the requirements of this office with regard to approval of plans."

We agree with the district court's conclusion that the Department of Water Administration in this application proceeding was concerned with the water which was being appropriated, and obtaining satisfactory proof that the water would actually be put to beneficial use, and not the status of the land upon which the fish rearing ponds might be constructed.

by a private person for his own benefit, that permanently and continuously cuts off the littoral owner's access to the lake at that point constitutes an unreasonable interference with the upland owner's littoral rights and may properly be enjoined." 95 Idaho at 555, 511 P.2d at 1331 (footnotes omitted).

The language in *West*, although not essential to its decision, was nevertheless in agreement with the holdings of this Court in earlier cases such as *Shephard v. Coeur d'Alene Lumber Co.*, 16 Idaho 293, 101 P. 591 (1909), in which this Court said:

"The [lumber company, which had been using the waterfront adjacent to the plaintiff respondent Shephard's land for storage and boom purposes,] cannot lawfully appropriate respondent's property to its own use in this manner. If it is in need of this water front for storage and boom purposes, it must acquire the right to the use in a lawful manner. To allow it to appropriate and use the waterfront along respondent's property in such a manner as to prevent her ingress and egress might deprive respondent of the principal use and benefit of her property and take from the property its chief value. Whether this right of ingress and egress is of any particular value to respondent or not can make no difference to the appellant; it is a property right of respondent's that must be respected, and she had a perfect right to resort to the court for the remedy she sought in this case. The injunction was properly issued, and the judgment of the trial court should be affirmed . . . ." 16 Idaho at 297, 101 P. at 593.

The language in these cases shows that the owner of property riparian or littoral to navigable water may enjoin the obstruction of the navigable water which prevents her access to the property via the navigable water and that this right attaches to every riparian or littoral point. In this case, the plaintiff Hull was cut off from all access to her property via the estuary. The court's remedy was proper to protect her property rights and the rights of the general public to navigation in the estuary.

Judgment affirmed. Costs to respondents.

McFADDEN, C. J., and DONALDSON, SHEPARD and BISTLINE, JJ., concur.