147 P.3d 75

In the MATTER of the Ownership of SANDERS BEACH regarding lands south of Government Lot 5, Section 24, TWP 50 North, Range 4 West, BM between Eleventh Street and Fifteenth Street, City of Coeur d'Alene.

The City of Coeur D'Alene and William Douglas, in his capacity as Kootenai County Prosecuting Attorney, Plaintiffs–Respondents,

v.

Michael L. and Jeanette G. Mackin, Wesley L. and Margaret E. Delaney, Wayne and Nancy Nash, Susan Cliff, Gerald and Patricia M. Frank, Charles S. and Shirley M. Wilke, Dawn C. Kettell, Berger Family Investments, LLC, Richard and Nona Barclay, and John C. Brett, Defendants–Appellants,

and

State Board of Land Commissioners, Dirk Kempthorne, Governor, Lawrence G. Wasden, Attorney General, Benito T. Ysursa, Secretary of State, Keith L. Johnson, Controller, Marilyn Howard, Superintendent of Public Instruction, Defendants–Cross Defendants–Appellants,

and

State of Idaho, Third Party Defendant–Appellant,

and

T. Gregory and Shana R. Crimp, Defendants–Cross Claimants–Third Party Plaintiffs–Respondents,

and

Sanders Beach Preservation Association, Inc., Defendant–Cross Claimant–Respondent,

and

Coeur D'Alene Lakeshore Property Owners Association, Greg Delavan, Gary Bartoo, and John McGruder, Interveners–Appellants,

and

The Idaho Conservation League, Intervener–Cross–Appellant.

Nos. 32337, 32380, 32410, 32411, 32443, 32444, 32970, 32971.

Supreme Court of Idaho, Coeur d'Alene, September 2006 Term.

Sept. 22, 2006.

Rehearing Denied Nov. 20, 2006.

John F. Magnuson, Coeur d'Alene, for appellants Michael and Jeanette Mackin, Wesley and Margaret Delaney, Wayne and Nancy Nash, Susan Cliff, Gerald and Patricia Frank, Charles and Shirley Wilke, Dawn Kettell, and Berger Family Investments, LLC.

Richard K. Kuck, P.C., Coeur d'Alene, for appellant John Brett.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellants State Board of Land Commissioners and State of Idaho. Nicholas Krema argued.

Paine Hamblen Coffin Brooke & Miller, Coeur d'Alene, for appellants Coeur d'Alene Lakeshore Property Owners Association, Greg Delavan, Gary Bartoo, and John McGruder. Peter Erbland argued.

William M. Eddie, Boise, for cross-appellant Idaho Conservation League.

Quane Smith, Coeur d'Alene, for respondents City of Coeur d'Alene and William Douglas. Michael Haman argued.

Givens Law Firm, Coeur d'Alene, for respondents Gregory and Shana Crimp. Raymond Givens argued.

Scott W. Reed, Coeur d'Alene, for respondent Sanders Beach Preservation Association, Inc.

EISMANN, Justice.

This is an appeal from a judgment determining that the ordinary high water mark of Lake Coeur d'Alene at a place called Sanders Beach is 2130 feet above sea level and that the abutting property owners do not have the right to exclude the public from that portion of the beach below such ordinary high water mark when it is not covered by water. We vacate the judgment and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

On October 19, 2004, the City of Coeur d'Alene and William Douglas, in his capacity as the Kootenai County Prosecuting Attorney, (herein jointly called "City") brought this action to have the ordinary high water mark (OHWM) determined for a portion of shoreline known as Sanders Beach on Lake Coeur d'Alene. The beach at issue is bounded on the east by 11th Street, on the west by 15th Street, on the north by seawalls, and on

the south by the ordinary high water mark (OHWM) of Lake Coeur d'Alene.

The State of Idaho owns, in trust for the public, title to the bed of navigable water lying below the OHWM as it existed at the time Idaho was admitted into the Union. We had previously ruled that the OHWM of Lake Coeur d'Alene at the time of statehood was presumed to be 2128 feet above sea level. On motions for summary judgment, the district court in this case determined that the OHWM was 2130 feet. Because of the gradual incline of Sanders Beach, raising the OHWM by two feet would transform much of the beach into state-owned property.

The property owners along the beach sought a ruling that their littoral rights gave them authority to exclude the public from that portion of the abutting lakebed not covered by water. The district court rejected their argument and held that their littoral rights did not include the right to exclude the public from state land.

The district court entered a two part judgment. Paragraph 1 set the OHWM of Lake Coeur d'Alene at Sanders Beach at an elevation of 2130 feet above mean sea level. Paragraph 2 denied the property owners' claim that their littoral rights permitted them to exclude the public from the lake bed when it was not covered by water. After entering judgment, the district court certified it as final pursuant to Rule 54(b) of the Idaho Rules of Civil Procedure. These appeals then followed.

## II. ISSUES ON APPEAL

1. Did the district court err in determining that the OHWM of Lake Coeur d'Alene at Sanders Beach was 2130 feet above mean sea level?

2. Did the district court err in granting the City's motion for a preliminary injunction?

3. Did the district court err in holding that the littoral rights of owners of property abutting navigable waters do not include the right to exclude the public from dry land lying below the OHWM?

4. Are either the Crimps or the Sanders Beach Preservation Association, Inc., entitled to an award of attorney fees against the State Board of Land Commissioners, the commissioners individually, or the State of Idaho?

## III. ANALYSIS

██ In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Infanger v. City of Salmon,* 137 Idaho 45, 44 P.3d 1100 (2002). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id.*

A. **Did the District Court Err in Determining that the OHWM of Lake Coeur d'Alene at Sanders Beach Was 2130 Feet Above Mean Sea Level?**

██ The State of Idaho owns, in trust for the public, title to the bed of navigable waters below the OHWM as it existed on July 3, 1890, when Idaho became a state. *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improvement Dist.,* 135 Idaho 316, 17 P.3d 260 (2000); *Erickson v. State,* 132 Idaho 208, 970 P.2d 1 (1998). The OHWM is "the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes." I.C. § 58–104(9). In *Erickson v. State,* we held that the OHWM of Lake Coeur d'Alene was presumed to be its current level of 2128 feet above sea level. The district court determined that the OHWM was 2130 feet above sea level at Sanders Beach. In doing so, the court erred in several respects.

■ **1.** **The district court erred in holding that the ordinary high water mark of Lake Coeur d'Alene could vary by several feet from place to place around the lakeshore.** The district court held that the OHWM of Lake Coeur d'Alene varied from place to place around the lakeshore. It therefore ruled that evidence of the OHWM at other areas around the lake was "inadmissible and rejected because it is based upon . . . the erroneous conclusions that the OHWM must be the same at all locations on the lake."

■ The OHWM is a line created by the water in the lake remaining at particular level for a long enough period of time that it deprives the soil covered by the water of its vegetation. Since the OHWM is created by the water covering the soil for a period of time, and since water seeks its level, the OHWM will be the same at all places around the lake. As we said in *Raide v. Dollar,* 34 Idaho 682, 690, 203 P. 469, 472 (1921) (emphasis added), "By the term 'high-water *mark*' is meant those *points* along the shore where water rises to such a height as may reasonably be anticipated. . . ."

The district court's rejection of evidence from other areas around the lake can only be based upon the assumption that under normal conditions the elevation of the water in one part of the lake could be several feet higher than the elevation of the water in another part of the lake. We commented upon that assumption in *Petajaniemi v. Washington Water Power Co.,* 22 Idaho 20, 26, 124 P. 783, 784 (1912), wherein we stated, "The courts will take judicial notice of the fact that water seeks its level; and if a witness should testify that it stood up in hillocks or piles, like stone or earth, a court would not be expected to believe it."

■ As we said in *Erickson v. State,* 132 Idaho 208, 212, 970 P.2d 1, 5 (1998) (emphasis added), "[T]o prove the OHWM, evidence must be presented which establishes *a* specific line impressed upon the soil." The OHWM of a lake is *a* specific line, not differing specific lines. Thus, in *Erickson* we stated with respect to Lake Coeur d'Alene, "[T]he current OHWM of *the Lake*

is 2128 feet." *Id.* at 211, 970 P.2d at 4 (emphasis added).

The district court supported its rejection of conflicting evidence from other parts of the lake by its misinterpretation of the following statement from *Driesbach v. Lynch,* 71 Idaho 501, 507, 234 P.2d 446, 449 (1951).

Appellants assign as error the ruling of the court in refusing to admit defendants Exhibit No. 11 in evidence; this exhibit is a photograph of the shore line of other property in the same general area, but not involved in this litigation, and the photograph itself did not establish or purport to establish the elevation at the point where the photograph was taken and, furthermore, the shore line of the particular area involved was not of such a character as to make it impossible to establish the ordinary or natural high water mark without resort to evidence as to conditions at other points on the Lake; where this is so, it is not prejudicial error to refuse to admit in evidence conditions at other places on the shore of the same lake to aid in a determination as to the ordinary or natural high water line of the property in dispute.

According to the district court, by the above-quoted statement this Court "implicitly required a site specific determination"—meaning a determination without reference to evidence from any other sites around the lake. We did not so hold in *Driesbach v. Lynch.* We merely held that where the OHWM at the site in question could readily be determined, it was not prejudicial error to refuse to admit a photograph of another site where that photograph did not establish or purport to establish the OHWM.

■ **2.** **The district court erred in its reliance upon the "vegetation test."** In reaching its decision that the OHWM was 2130 feet, the district court relied primarily upon the lack of vegetation at Sanders Beach and secondarily upon records showing the high water levels for the years 1893 through 2004. In doing so, the district court erred.

■ Before the dams were built on the Spokane River, the water level in Lake Coeur d'Alene fluctuated several feet during the year. It was higher during the spring

runoff and lower later in the year. The OHWM is not the highest level that the water reaches during the year. "By the term 'high-water mark' is meant those points along the shore where water rises to such a height as may reasonably be anticipated, but does not include such extraordinary freshets as cannot be anticipated." *Id.* Soil covered by water during the spring runoff could sustain vegetation after the water level receded. *Petajaniemi v. Washington Water Power Co.,* 22 Idaho 20, 124 P. 783 (1912). "The OHWM is not determined by how often the water drops below or rises above a certain level." *Erickson v. State,* 132 Idaho 208, 212, 970 P.2d 1, 5 (1998).

Likewise, the OHWM is not determined by whether there is vegetation in a particular place on the lakeshore. "While the presence of vegetation, the 'vegetation test', is important in determining the OHWM, it is merely 'an aid' in that determination; not the sole and exclusive means of proving the location of that line." *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improve. Dist.,* 135 Idaho 316, 321, 17 P.3d 260, 265 (2000). The lack of vegetation in a particular place can be from reasons other than being covered by water for a long enough period of time to deprive the soil of vegetation. A sandy beach devoid of vegetation can be above the OHWM. *Deffenbaugh v. Washington Water Power Co.,* 24 Idaho 514, 135 P. 247 (1913). The OHWM is based upon the water ordinarily covering the soil for a sufficient period of time to destroy the value of the land for agricultural purposes by preventing the growth of vegetation. It is not based upon the action of waves or current undermining or eroding banks and shorelines above the level of the water when in repose. *Payette Lakes Protective Ass'n v. Lake Reservoir Co.,* 68 Idaho 111, 189 P.2d 1009 (1948).

We held that the district judge in the *Idaho Forest Industries, Inc.,* case properly analyzed the vegetation test when he stated:

It is the conclusion of this Court that the vegetative definition of "ordinary high water mark," as judicially defined in Idaho cases beginning with *Raide v. Dollar, supra,* should be utilized only under circumstances where the conditions lend themselves to its applicability. In cases where no evidence can be found which could support a finding of an actual line impressed on the soil on July 3, 1890, it is my conclusion that the true required finding of fact continues to be simply the "ordinary high water mark," which may be established by evidence that is unrelated to either soil or vegetation.

135 Idaho at 321, 17 P.3d at 265.

**3. The district court erred in failing to consider historical facts regarding the OHWM of Lake Coeur d'Alene.** The district court erred in disregarding the historical facts as to how the level of Lake Coeur d'Alene has been maintained since 1907. In *Erickson v. State,* 132 Idaho 208, 211, 970 P.2d 1, 4 (1998), we held, "Considering that the current OHWM of the Lake is 2128 feet, it is presumed that the State is holding the title to these lands in trust for the public." In *Idaho Forest Industries, Inc. v. Hayden Lake Watershed Improvement District,* 135 Idaho 316, 319, 17 P.3d 260, 263 (2000), we explained that presumption as follows:

The presumption in Erickson was based upon the current OHWM of Lake Coeur d'Alene. Using dams located at Post Falls, the Washington Water Power Company has maintained the level of Lake Coeur d'Alene at 2128 feet above msl throughout the summer and into early fall of every year since 1907. The consistent maintenance of a single water level for over ninety years established a certain current OHWM, justifying the presumption the State was holding the property [below that level] in trust.

The presumption we stated in *Erickson v. State* must be considered in context of the historical facts and the issue in that case. The plaintiffs were seeking to prove that the OHWM was below 2128 feet. Considering that the existing OHWM of 2128 feet had been maintained for over ninety years, we held that it was presumed that land below that level was owned by the State and the plaintiffs would have to overcome that presumption by clear and convincing evidence. Because they had not done so, we reversed

the judgment of the district court to the contrary. The presumption in *Erickson v. State* only applied to attempts to prove that the OHWM was below 2128 feet. When the effect upon the lake's water level caused by the dams maintained since 1907 is taken into consideration, it is clear that the OHWM on July 3, 1890, was not higher than its current level of 2128 feet. The dams did not lower the water level in the lake from its prior level.

In 1904, the Washington Water Power Company (WWP) began building dams on the Spokane River at Post Falls, Idaho, and it finished them in 1907. The main dam had a contrivance known as a "bear trap" that enabled the water behind the dam to be held at a level ten feet higher than the overflow of the dam. *Washington Water Power Co. v. Waters,* 19 Idaho 595, 115 P. 682 (1911). Because the Spokane River is the outlet of Lake Coeur d'Alene, the dam raised the water level, at least during parts of the year, in both the lake and in the Coeur d'Alene and St. Joe rivers that feed into the lake. There were also allegations that the dam caused flooding along the St. Maries River that feeds into the St. Joe River. As a result, litigation followed from those who sought damages for the flooding of their property.

The August 9, 1907 edition of the Coeur d'Alene Press included a report of a threatened lawsuit because perhaps two hundred ranchers had their hay crops flooded by the dam. The January 2, 1908 edition of the same newspaper reported that a lawsuit had been filed by an Elmer Doty and others. In another lawsuit, a divided Idaho Supreme Court upheld the trial court's refusal to transfer venue out of Kootenai County. *Gibbert v. Washington Water Power Co.,* 19 Idaho 637, 115 P. 924 (1911). The motion for change of venue had been supported by an affidavit stating that a petition signed by all taxpayers along the St. Joe, St. Maries, and Coeur d'Alene rivers had been presented to the Kootenai County Commissioners asking that they take steps to prevent the overflow of lands along those rivers and stating that county roads and bridges had also been damaged by the overflow during the last two years. The motion was also supported by a report from the Daily Spokesman Review that the Speaker of the Idaho House of Representatives had stated that "the people of Idaho must ultimately win in their fight with the Washington Water Power Company for the reclamation of the thousands of acres of farming land submerged by the back-waters from the Post Falls Dam." 19 Idaho at 642, 115 P. at 926. In dissent, Justice Sullivan stated, "It clearly appears to me from the affidavits filed in support of said motion that the feeling in said county has been very bitter against the appellant corporation." 19 Idaho at 651, 115 P. at 929.

WWP instituted a number of lawsuits to condemn lands overflowed because of the operation of its dam at Post Falls. One of those cases came up on appeal to decide the issue of whether the use that WWP intended to make of the defendant's land constituted a public use. *Washington Water Power Co. v. Waters,* 19 Idaho 595, 600–01, 115 P. 682, 683 (1911). The intended use was to enlarge the storage capacity of Lake Coeur d'Alene for the purpose of generating electricity. This Court described that intended use as follows:

> It is admitted by all parties that the condemnation here sought is for reservoir or storage basin purposes; in other words, the appellant seeks to enlarge the capacity of Coeur d'Alene Lake by means of a dam and bear trap at Post Falls, and this increased reservoir or storage basin capacity is for the specific purpose of generating electricity. It is for power and lighting purposes.

19 Idaho at 606, 115 P. at 685. This Court described how the operation of the dam at Post Falls affected the water level in Lake Coeur d'Alene as follows:

> The appellant company [WWP], by closing its headgates at Post Falls and raising the bear trap, is enabled to raise and hold the level of the waters of Coeur d'Alene Lake and the Coeur d'Alene and St. Joe rivers about 6 1/2 feet higher than their natural level, and the waters when so held overflow and cover many thousands of acres of the low meadow and grass lands along and contiguous to these streams, including about 60 acres belonging to the respondents. By means of thus raising the dam

at Post Falls and accordingly raising the elevation of the water in the Coeur d'Alene Lake approximately 6 1/2 feet, the appellant is enabled in seasons of low water to increase the capacity of its two plants, the one at Post Falls in Idaho, and the one in Spokane, Wash., approximately 18,000 horse power. Of this increased capacity approximately 4,750 additional horse power is generated at Post Falls.

*Id.* at 600–01, 115 P. at 683.

In *Petajaniemi v. Washington Water Power Co.*, 22 Idaho 20, 124 P. 783 (1912), this Court upheld judgments against WWP in two consolidated cases for the flooding and permanent overflow of the plaintiffs' lands located along the Coeur d'Alene River. In affirming the award, we acknowledged that the operation of the dam below Lake Coeur d'Alene caused flooding along the Coeur d'Alene River, which feeds into the lake. We described what occurred as follows:

> This increased height in the dam naturally resulted in submerging the lands adjacent to Coeur d'Alene Lake and the streams flowing into the lake to an elevation of at least 2,126.5 feet. The result was that the Coeur d'Alene river was raised above its banks for some distance up the stream; and the waters were spread out over the valley, submerging a great portion of the lowlands along the stream. The water is held back by reason of these dams being raised until so late in the summer that crops cannot be grown on the lands submerged; and such lands are, for all practical purposes, completely taken and appropriated by the company, and the remaining lands are necessarily damaged to a large extent by reason of the water being raised above the banks of the river and spread out, so as to make sloughs and inlets in the lowlands.

22 Idaho at 24–25, 124 P. at 784. We commented as to the dam's effect on the ordinary high water mark as follows:

> If the dam had the effect of raising the level of the water in Coeur d'Alene river above the banks of the stream, then it must necessarily follow that when the high and flood waters come down the river in the early summer they will, of course, flood more land for a time than was previously submerged; and at such times the high-water mark is bound to be above the elevation of the dam at Post Falls. If a flood in a stream of water did not raise the elevation of the water above the ordinary water line, then there would be no danger from floods, but we know it does do so; and one who raises, by artificial means, the ordinary high-water elevation should pay the damages caused to a landowner by reason of the flood waters reaching a still higher level and flooding still more land than would have been the case, had the change not been made.

*Id.* at 28, 124 P. at 785.

In *Deffenbaugh v. Washington Water Power Co.*, 24 Idaho 514, 135 P. 247 (1913), we upheld a judgment against WWP for flooding about five acres of sand beach on Lake Coeur d'Alene. In that opinion, we stated:

> The water collects in Lake Coeur d'Alene from various streams emptying into it during the winter and spring until the elevation is raised six or eight feet above the ordinary elevation of the water in the summer and fall. The purpose of this dam is to hold the water back from running off in the spring and summer so rapidly, and to hold the level thereof at an elevation of 2,128 feet, whereas, if the flow was not so retarded by this dam and bear trap, it would run off much more rapidly, and by the middle of the summer would be reduced to an elevation of about 2,121.5.

24 Idaho at 520–21, 135 P. at 248.

The above history simply shows that the dams completed in 1907 did not lower the ordinary high water elevation of the waters of Lake Coeur d'Alene. It was not higher before the dams were constructed than it was afterwards. After the dams were completed, the ordinary high water mark has been at 2128 feet above mean sea level. *Idaho Forest Industries, Inc. v. Hayden Lake Watershed Improvement District,* 135 Idaho 316, 17 P.3d 260 (2000); *Erickson v. State,* 132 Idaho 208, 970 P.2d 1 (1998). That is the highest it could have been in 1890.

In paragraph 1 of its judgment, the district court determined, "[T]he location of the ordinary high water mark (OHWM) of Coeur d'Alene Lake relating to such property [Sanders Beach] as it existed on July 3, 1890 is at an elevation of 2130 feet." For the above reasons, the district court's determination was in error. We therefore vacate paragraph 1 of the judgment.

The Idaho Conservation League cross-appealed, arguing that the OHWM should be 2134 feet above sea level, which would coincide with the toe of the highest sea walls making the entire Beach public property. The above analysis resolves that cross-appeal.

**B. Did the District Court Err in Granting the City's Motion for a Preliminary Injunction?**

On October 19, 2004, the City filed a motion for a preliminary injunction seeking to restrain the property owners from excluding the public from Sanders Beach. On April 15, 2005, the district court entered an order granting the motion, giving the public access to the beach from the toes of the seawalls to the water. The seawalls had been constructed by various landowners, and the toes of the seawalls ranged from 2134.3 to 2130 feet above sea level. In granting the preliminary injunction, the district court did not "set forth the findings of fact and conclusions of law which constitute[d] the grounds of its action," as required by Rule 52(a) of the Idaho Rules of Civil Procedure. Since the public has no right to access Sanders Beach above the OHWM and since the OHWM of Lake Coeur d'Alene has been 2128 feet since 1907, *Erickson v. State*, 132 Idaho 208, 970 P.2d 1 (1998), it is not clear what status quo the district court was preserving by granting the public access up to

2134 feet. The City argues that the toes of the seawalls were an easily identifiable line of demarcation to preserve the peace by designating which part was private property and which part was state property open to the public. That line of demarcation gave the public access to the entire beach even though part of the beach was clearly private property. The ease of identifying a line of demarcation does not justify taking private property for public use without paying just compensation. Nevertheless, the district court has since vacated its preliminary injunction. The issue is therefore moot insofar as this case is concerned.[1]

**C. Did the District Court Err in Holding that the Littoral Rights of Owners of Property Abutting Navigable Waters Do Not Include the Right to Exclude the Public from Dry Land Lying Below the OHWM?**

On June 14, 2005, Michael and Jeanette Mackin, Wesley and Margaret Delaney, Wayne and Nancy Nash, Susan Cliff, Gerald and Patricia Frank, Charles and Shirley Wilke, and Beach Brothers, Inc.,[2] filed a motion for partial summary judgment seeking a ruling that they, as owners of lakeshore property, could exclude the public from that portion of the lakebed between the OHWM and the OLWM (ordinary low water mark) when it was not covered by water. They argued that the right to exclude the public from that portion of the lakebed was included in their littoral rights under the common law. The district court denied their motion, holding that their littoral rights did not include the right to exclude the public from the exposed lake bed. The moving parties[3] along with Greg Delavan, Gary Bartoo, John McGruder and the Coeur d'Alene Lakeshore Property Owners Association (herein all col-

---

1. The issue would not be moot had the City posted security for the payment of such costs and damages including reasonable attorney's fees to be fixed by the court, as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. *Jones v. Stauffer*, 49 Idaho 387, 288 P. 419 (1930). As a political subdivision of the state, however, the City was not required to post security. I.R.C.P. 65(c).

2. Beach Brothers, Inc., later sold its property to Dawn C. Kettell, and on August 1, 2005, she was substituted for it as a party in this lawsuit.

3. On June 15, 2005, John Brett joined in the motion in the district court, but he did not appeal the district court's denial of that motion. He appealed only the district court's determination as to the OHWM. This reference to the "moving parties" does not include Brett.

lectively called "Lakeshore Owners") appeal that order.

The Lakeshore Owners argue that the common law of England applies and that under the English common law littoral rights include the right to exclude the public from land between the OHWM and OLWM when it is not covered by water. They rely upon *Blundell v. Catterall,* 106 Engl. Reprint 1190 (1821) for their argument regarding the scope of littoral rights under the English common law. The Lakeshore Owners misread that case. It had nothing to do with littoral rights. The issue was whether members of the public had a common-law right to trespass upon the land of another in order to access the sea for bathing.[4]

*Blundell v. Catterall* was an action for trespass brought by the lord of the manor of Great Crosby, which was bounded on the west by the River Mersey, an arm of the sea. The defendant was an employee of a hotel that kept "bathing machines" for use by its guests. Bathing machines were windowless, roofed and walled wooden carts that could be rolled into the sea. They were commonly horse drawn. They provided a place for people to change into their bathing suits and enabled them to then be transported from the land into the sea without being exposed to public view, in keeping with Victorian no-

tions of modesty. Once the bathing machine was stopped in the sea, the bather would exit from a door facing out to sea and enjoy the water. When done, he or she would re-enter the bathing machine to be transported back to shore and to change back into street clothing. For a fee paid by the guests, the defendant drove the bathing machines. The defendant contended that he had a common law right to travel across the lord's property in order to access the sea for the purpose of bathing. The court rejected that argument, with each justice writing separately. Justice Best wrote in favor of the defendant (hotel employee), and Justices Holroyd and Bayley and Chief Justice Abbott wrote in favor of the plaintiff (the lord of the manor).

The *Blundell* court's opinion was not based upon the plaintiff's littoral rights. It was based upon three factors. First, as lord of the manor the plaintiff owned the land down to the low-water mark. Although the land between the high- and low-water marks was typically owned by the sovereign, the law in existence when the manor was created granted title in the lord of the manor down to the low-water mark. The defendant was trespassing both upon the lord's land above the high water mark and upon the lord's land between the high water mark and the low water mark. Second, the English courts had

---

4. Separate opinions written by Chief Justice Abbott and Justices Holroyd and Bayley constituted the decision in the case. When stating the issue in the case, each of them recognized that the real property upon which the trespass occurred, including the land between the high and low water marks, was the private property of the lord of the manor. Chief Justice Abbott stated that the issue was as follows:

> This is an action of trespass, brought against the defendant for passing with carriages from some place above high-water mark across that part of the shore which lies between the high and low water-mark, for the conveyance of persons to and from the water for the purpose of bathing. *The plaintiff is the undoubted owner of the soil of this part of the shore,* and has the exclusive right of fishing thereon with stake-nets.

*Blundell v. Catterall,* 106 Engl. Reprint 1190, 1205 (1821) (emphasis added). Justice Holroyd stated that the issue to be decided was as follows:

> The question put in this case for our opinion, is the general question, whether there is a common-law right for all the King's subjects to

bathe in the sea, and to pass over the sea-shore for that purpose, on foot and with horses and carriages. But, coupled with the facts stated in the case, the question really is, whether there is a common-law right in all the King's subjects to do so in the locus in quo, *though the soil of the sea-shore,* and an exclusive right of fishing therein in a particular manner (namely, with stake nets), *are private property belonging to a subject,* and though the same have been a special peculiar property from time immemorial.

*Id.* at 1197 (emphasis added). Likewise, Justice Bayley stated the issue as follows:

> The question in this case is, whether there is a common law right for all the King's subjects to bathe upon the sea-shore, and to pass over it for that purpose, upon foot, and with horses and carriages, notwithstanding *that part on which the right is claimed, is, as to its soil, vested in a particular individual,* and although that individual has an exclusive right of fishing in that place with stake nets, and of driving these stakes into the soil, that they may support the nets.

*Id.* at 1203 (emphasis added).

453

never recognized a common law right in citizens to access the sea for bathing wherever they wished along the seashore. Third, recognizing any such common law right would interfere with the exclusive right of the lord of the manor to erect stake nets on the shore for fishing. The lord's right to erect such nets would be inconsistent with the claimed right of public access anywhere along the beach because there could be no access to the sea where the stake nets had been set up.

Idaho Code § 73–116 provides, "The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state." We need not search English law to see whether there is an English case upholding the Lakeshore Owners' view of littoral rights because "[b]y the adoption of that section this state did not adopt the common law of England when such common law was inapplicable to the conditions of the state." *Northern Pac. Ry. Co. v. Hirzel*, 29 Idaho 438, 453, 161 P. 854, 857 (1916).

■ Under Idaho law, "a riparian owner (on a navigable river or stream) or a littoral owner (on a navigable lake) takes title down to the natural high water mark." *West v. Smith*, 95 Idaho 550, 554, 511 P.2d 1326, 1330 (1973). "[T]he State owns in trust for the public title to the bed of navigable water below the OHWM as it existed at the time the State was admitted into the Union." *Erickson v. State*, 132 Idaho 208, 210, 970 P.2d 1, 3 (1998). The land at issue is that portion of the lake or river bed lying below the OHWM when it is not covered by water. Although it is State land, the Lakeshore Owners contend that they should have the right to exclude others from it.

We have held that the owner of property riparian or littoral to navigable water has the right to access such water at all points along the landowner's waterfront, and the owner may enjoin persons obstructing such access. *Ritter v. Standal*, 98 Idaho 446, 566 P.2d 769 (1977). The claimed right in this case is separate from the Lakeshore Owners' right to access the lake at all points along their respective waterfronts. Someone walking along the lake on dry land below the OHWM would not impact such right any more than someone walking in the water.

■ Granting the Lakeshore Owners the right to exclude the public from this portion of state land would be inconsistent with the public trust doctrine. Under that doctrine, "the state holds the title to the beds of navigable lakes and streams below the natural high-water mark for the use and benefit of the whole people." *Callahan v. Price*, 26 Idaho 745, 754, 146 P. 732, 735 (1915). "This trust preserves the public's right of use in such land." *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improvement Dist.*, 112 Idaho 512, 516, 733 P.2d 733, 737 (1987). Although initially limited to uses incident to navigation, "the public trust doctrine has been expanded to include uses other than those strictly incident to navigation. *Kootenai Environmental Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 105 Idaho 622, 671 P.2d 1085 (1983) (public trust uses include those of fish and wildlife habitat, recreation, aesthetic beauty and water quality)." *Id.* In 1927 the legislature expressly provided that lakeshores between the ordinary high- and low-water marks of Coeur d'Alene Lake and two other lakes "are hereby declared to be devoted to a public use in connection with the preservation of said lakes in their present condition as a health resort and recreation place for the inhabitants of the State." Ch. 2, § 2, 1927 Idaho Sess. Laws 6, 7 (now codified as I.C. § 67–4305). Creating the littoral right requested by the Lakeshore Owners would give them the exclusive right to occupy this portion of State land, even though the State holds such land in trust to preserve the public's right of use in the land. Such littoral right would be contrary to the central substantive thought in public trust litigation, which we have stated is as follows:

> [w]hen a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon *any* governmental conduct which is calculated *either* to relocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties.

*State ex rel. Haman v. Fox*, 100 Idaho 140, 149, 594 P.2d 1093, 1102 (1979) (quoting from

454

J. Sax, The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention, 68 Mich.L.Rev. 473, 490 (1970) (emphasis in text)). We therefore decline to create the littoral right requested by the Lakeshore Owners. Their littoral rights do not include the right to exclude the public from that portion of the exposed lake bed lying below the OHWM.

The district court correctly held that the Lakeshore Owners' littoral rights did not include the right to exclude the public from land below the OHWM when it was not covered by water. In paragraph 2 of its judgment, however, the district court stated, "The homeowners' littoral rights do not include exclusive control of any exposed lake bed south from said south boundary of Government Lot 5 (elevation of 2130 feet) to the water's edge." Because the OHWM is not above 2128 feet, this paragraph of the judgment is erroneous in part. We therefore also vacate paragraph 2 of the judgment.

**D. Are either the Crimps or the Sanders Beach Preservation Association, Inc., Entitled to an Award of Attorney Fees Against the State Board of Land Commissioners, the Commissioners Individually, or the State of Idaho?**

Gregory and Shana Crimp asked the district court to award them attorney fees against the State Board of Land Commissioners, the commissioners individually, and the State of Idaho. They appeal the district court's refusal to do so and also seek attorney fees on appeal. In their brief, they state, "Crimps should be awarded their attorney fees if the determination is anything other than adopting the Land Board's position of a 2128' OHWM at Sanders Beach." From their arguments, it is apparent that their claim for attorney fees is based upon an ultimate finding that the OHWM is above, not below, 2128 feet. Because we hold that the OHWM of Lake Coeur d'Alene cannot be above 2128 feet, we need not address their arguments. They were not entitled to an award of attorney fees. We affirm the order of the district court denying their request for attorney fees and deny their request for an award of attorney fees on appeal.

The Sanders Beach Preservation Association, Inc., also sought an award of attorney fees in the district court and seeks and award of attorney fees on appeal. It seeks attorney fees against the individual members of the State Board of Land Commissioners and the State of Idaho. The district court denied its request, and so do we. Like the Crimps, the Association's arguments are based upon the assertion that the OHWM of Lake Coeur d'Alene is above 2128 feet.

## IV.  CONCLUSION

We vacate the judgment of the district court and remand this case for further proceedings consistent with this opinion. We uphold the denial of attorney fees to the Crimps and to the Sanders Beach Preservation Association, Inc., and we deny their requests for an award of attorney fees on appeal. We award costs on appeal to the State of Idaho, the State Board of Land Commissioners, and to John C. Brett.

Chief Justice SCHROEDER, and Justices TROUT, BURDICK and JONES concur.